# M&B
## MOSKOWITZ & BOOK, LLP

Avraham C. Moskowitz
AMoskowitz@mb-llp.com

345 Seventh Avenue, 21st Floor
New York, NY 10001
Phone: (212) 221-7999
Fax: (212) 398-8835

September 22, 2020

**VIA ECF**              **SENTENCING MEMORANDUM**

Hon. J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:    <u>United States v. Ramos et al.</u>
                 20 Cr 29-4 (JPO)

Dear Judge Oetken:

      Even good people can make terrible mistakes. That is exactly what happened to Carlos Ramirez in this case. After fleeing an escalating wave of violence in Columbia, his country of birth, Carlos built a successful career—and ultimately a thriving independent business—in the long-haul trucking industry in the United States. Unfortunately, after a decades-long career, Carlos, who has no prior criminal history, made the mistake of agreeing to supplement his income by allowing his co-worker, Mario Ramos, to transport packages of money or narcotics in the truck that the two of them were driving cross-country. Carlos did not know that the packages contained fentanyl and heroin, instead suspecting, based on Ramos's comments, that they contained money or cocaine. Despite his suspicion that the packages contained contraband, however, and against his better instincts, Carlos continued to transport them. Carlos's lapse of judgment, made by a hard-working and devoted family man, has already cost him his business and derailed the career he worked for decades to build. It need not destroy his life, and the lives of the family members he has worked so hard to support.

    **I.**    <u>**The 3553(a) Factors Support the Imposition of a Below Guidelines Sentence**</u>

      As the Supreme Court has repeatedly explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Peugh v. United States*, 569 U.S. 530, 536, 133 S. Ct. 2072, 2080 (2013) (*quoting Gall v. United States*, 552 U.S. 38, 49 (2007)). After calculating the appropriate Guidelines range, the Court must consider the § 3553(a) factors, make an individualized assessment, and impose a sentence that is

Hon. J. Paul Oetken
September 22, 2020
Page 2

"sufficient, but not greater than necessary" to meet the objectives of sentencing. *See* 18 U.S.C. § 3553(a); *Gall v. United States, supra.*

The Defendant agrees that the Guidelines calculations set forth in the Presentence Investigation Report ("PSR") prepared by the Probation Department are correct, and that Carlos qualifies for the safety valve, making the statutory mandatory minimum sentence inapplicable. In considering the appropriate sentence to impose upon Carlos, however, it must be noted that Carlos believed he was transporting cocaine, not fentanyl. Had be been correct, based on the total weight for which he is being held responsible, Carlos's Base Offense Level pursuant to USSG § 2D1.1 and the accompanying Drug Quantity Table would have been 32, not 36, and he would be facing a Guidelines range of 70 to 87 months, rather than a range of 108 to 135 months. Although Carlos is not seeking a downward departure in this case, Carlos' ignorance as to the type of drugs that he was transporting is a factor that the Court can and should consider in determining his sentence.

    A.    <u>The Nature and Circumstances of the Offense</u>

The facts related to the criminal conduct for which Carlos pleaded guilty are fully set forth in the PSR and, accordingly, will not be set forth in detail herein. Two aspects of the offense are noteworthy, however. First, the transaction which led directly to Carlos's arrest was only the second time that Ramos required him personally to deliver contraband; on all but that one prior occasion, Carlos's role was limited to driving Ramos and his contraband to locations specified by Ramos, at which Ramos would deliver his packages while Carlos waited in the truck. Indeed, on several occasions, Ramos, who shared the cross-country driving with Carlos, delivered the packages while Carlos was asleep in the truck. Thus, the facts concerning the transaction set forth in the PSR are atypical and tend to overstate Carlos's role in the conspiracy. Second, it must be noted that this case is Carlos's first contact with the criminal justice system and represents an aberration in an otherwise law-abiding life. It is significant that Carlos never had contact with the source of the narcotics, never picked up the packages that were to be delivered, sometimes did not know with certainty whether the packages he transported with Ramos contained currency or a controlled substance, never knew the weight of the narcotics he was transporting and never even suspected that the substance in question was fentanyl, a drug that he had never even heard of. In that regard, it is important to note that Carlos explained to the Government the nature and extent of his involvement and knowledge during a "safety-valve" proffer and the Government accepted his explanation and agreed that he qualifies for the "safety valve."

    B.    <u>The History and Characteristics of the Defendant</u>

Carlos, who will turn 60 in November, was born and raised in Guadalajara de Buga, Colombia. His father worked in construction and his mother was a schoolteacher. Together, they earned enough to ensure that Carlos and his two younger siblings, Hubert and Margarita, never went hungry as children—but the family was nevertheless very poor by American standards. Buga was then a town of under 100,000 people, with an economy based primarily on cattle ranching and on providing services to the many Catholic pilgrims who

travelled from elsewhere in the country to visit Buga's famous basilica.  Work and opportunities for young people were scarce.

Like the rest of Colombia, Buga experienced an epidemic of violent crime beginning in the 1970s, as drug gangs fought to consolidate power in that country.  When Carlos was in his early 20s getting serious about the woman who would become his first wife, he reluctantly decided that he had no future in Buga, and that his only chance to start a family and keep it safe lay in emigrating to the United States.  Together with his future wife, Yolanda, Carlos left Buga in 1982 and travelled to the United States, where they settled in New Jersey.  Carlos became a naturalized citizen in 2000.

Upon arriving in the United States, Carlos sought work immediately.  At first, he worked odd jobs as a mechanic, painter, and construction worker; later, he enrolled in a commercial driving school, obtained a commercial drivers' license, and began working as a truck driver.  In 1989, seven years after emigrating from Colombia, Carlos and Yolanda married in Somerville, New Jersey.  Carlos worked increasingly long hours—but the money he earned made it possible for Yolanda to attend Kean University, where she earned a degree in clinical social work.  Carlos also sent a portion of his earnings home to Colombia every month, to help support his extended family there.

In 1998, Carlos and Yolanda relocated to Florida, where Carlos continued working as a driver.  They had a daughter, Katherine, in 2005.[1]  Three years later, Carlos was hired by Sunco Trucking as a long-haul driver, which provided a good income but kept him away from home for days at a time on a regular basis.  His relationship with Yolanda suffered as a result.  They decided to separate but maintained an amicable relationship, as evidenced by Yolanda's letter to the Court.  Carlos started his own trucking business in 2014, but he had a hard time building a customer base in Florida.  He and Yolanda moved to separate homes in California in 2015, where Carlos continued trying to build his business—but his new company failed a year later.  Carlos next accepted a position as a contract driver for the California location of a Utah-based logistics company, where he worked for two years before transferring to a more-lucrative contract driver job with a California-based company.  In 2019, just after his divorce from Yolanda became final, Carlos tried again to start his own company.  This time, he was successful.  By the time of his arrest in this case, his new company was profitable.

C. The Statutory Purposes of Sentencing Do Not Require a Guidelines Term of Incarceration

Having calculated the appropriate Guidelines range, and having considered the nature and circumstances of the offense and the history and characteristics of the Defendant, the Court must next consider the remaining elements set forth in 18 U.S.C. § 3553(a), to wit,

(2) the need for the sentence imposed

---

[1] Yolanda, Katherine, Carlos's brother Hubert, his sister Margarita, and several of his nieces and nephews have written letters to the Court, which are annexed together, in translation, as Exhibit 1 hereto.

Hon. J. Paul Oetken
September 22, 2020
Page 4

      (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B)    to afford adequate deterrence to criminal conduct;

      (C)    to protect the public from further crimes of the defendant; and

      (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; . . .

(3) the kinds of sentences available; [and]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

      The Defendant respectfully submits that these considerations weigh heavily in favor of imposing a substantially below-Guidelines sentence.

<u>Promoting Respect for the Law; Providing Just Punishment for the Offense</u>

      It is undisputed that Carlos's offense was a serious one—but it is also undisputed that his role in the offense was a comparatively minor one, and that the consequences of his conviction will be significant even in the absence of a Guidelines term of incarceration. Carlos was not the owner of the narcotics, did not initiate the conspiracy, did not pick up the narcotics from or deliver the money to the owner, was never told what type of narcotics was being transported or how much, and did not know to whom the narcotics was being delivered. It is notable that the Probation Department has recommended a significantly below-Guidelines sentence of 60 months' incarceration, largely in recognition of Carlos's strong work ethic, decades-long history of continuous gainful employment, and low risk of recidivism. While we agree that those factors support a significantly below-Guidelines sentence, it is respectfully submitted that the Probation Department's recommendation remains higher than necessary to achieve the statutory purposes of sentencing, largely because it is based on the fentanyl Guideline as a starting point, while Carlos believed he was assisting in the transportation of cocaine.

      It is submitted that basing Carlos's sentence on the fentanyl Guideline would undermine respect for the law, by suggesting that an individual defendant's culpability should be based on circumstances outside his knowledge and control, rather than on his subjective offense conduct. By contrast, if Carlos, who believed he was transporting cocaine or money, is punished as though he had in fact transported cocaine, that penalty would be a just punishment, and would promote respect for the law by demonstrating that those who knowingly commit an offense are

Hon. J. Paul Oetken
September 22, 2020
Page 5

appropriately penalized for their own intentional conduct. In that regard, it should be noted that in making its recommendation in this case, the Probation Department recommended that Carlos be sentenced to a term of imprisonment of 60 months, a sentence that represents approximately 55% of the bottom of the applicable guidelines range. Applying the same calculation to the cocaine guidelines that more accurately reflect Carlos' culpability results in a sentence of approximately 38 months. While even a sentence in that range is greater than necessary to achieve the objectives of sentencing articulated in Section 3553(a), such a sentence would certainly be a more just punishment and would promote greater respect for the law than would a harsher punishment based on the fentanyl guidelines.

In considering what punishment would be just, the Court should also be mindful of the collateral effects Carlos's conviction will have on him, and on the family he supports. Because of his offense, Carlos has already lost his business, been stripped of his commercial drivers' license, and his truck has been repossessed by his lender. Carlos will never again work in his chosen career or be permitted to pursue the profession in which he has been engaged for the bulk of his adult life. Instead, upon his release, Carlos will be reduced to doing the kinds of low-paying odd jobs and short-term construction work he pursued almost 40 years ago, when he was in his 20s, before he became a professional driver.

Finally, in considering the collateral effects of Carlos's conviction, it is notable that imposing any significant of term of imprisonment on Carlos will effectively guarantee that he will never again see his mother, who is 90 years old and in ill health.

<u>Protecting the Public; Affording Adequate Deterrence to Criminal Conduct</u>

A substantially below-Guidelines sentence would also be sufficient, but not greater than necessary, to protect the public from future crimes by Carlos and to deter criminal conduct among similarly-situated members of the general public. As is clear from Carlos's personal history and from his letter to the Court, annexed hereto as Exhibit 2, Carlos does not have a propensity to engage in unlawful acts and poses no danger to the public. He sincerely regrets the lapse of judgment that resulted in his engaging in criminal activity and is committed to returning to his prior life as a hard-working, law-abiding citizen. The poor judgment that brought him before the Court was an aberration in an otherwise law-abiding life. As even the Probation Department recognizes, Carlos's risk of recidivism is low. When he is released, he will return to the home he shares with his fiancé and resume his efforts to support his daughter and his entire extended family. He is highly unlikely ever to reoffend.

As for the issue of general deterrence, our judicial system and society at large recently have come to realize that even draconian sentences have not succeeded in stemming the tide of drug-trafficking or in preventing otherwise law-abiding people from having foolish, regrettable lapses of judgment when faced with the opportunity to make easy money simply by looking the other way and permitting an acquaintance to add contraband to legitimate shipments of goods. Indeed, such poor decision-making is the backbone of many narcotics-distribution schemes, which rely on couriers willing to engage in willful blindness, and there is a seemingly endless supply of individuals willing to engage in conduct of that kind despite the risk of imprisonment. No matter what penalty is imposed on Carlos, his sentence will do little to change

that reality. Finally, to the extent that the Court believes it is necessary to send a message to the public at large that this type of criminal behavior will be punished severely, that message can be delivered more effectively by imposing significant sentences on the more culpable defendants in the charged conspiracy. Accordingly, a Guidelines sentence, whether based on the fentanyl guidelines or on the cocaine guidelines, would be greater than necessary to deter criminal conduct by others similarly situated.

The Need to Provide Educational or Vocational Training; The Kinds of Sentence Available

Having lost his livelihood as a result of his offense, Carlos is likely to need vocational and educational training if he is to obtain long-term work after his release. It is submitted that his opportunities to obtain such vocational training will be far more limited in the prison system than in the outside world—and that Carlos, who is about to turn 60, is more likely to succeed in the future if he begins retraining sooner rather than later. Accordingly, imposing a significantly below-Guidelines sentence on Carlos, with terms of supervision to include a requirement that he obtain job training and seek employment, would be the most-effective way to ensure that his essential need for retraining is met and that he will have an opportunity to succeed upon completion of his sentence.

In considering the kinds of sentence available, the Court should also be mindful that Carlos, due to his age alone, will soon be in a high-risk group for severe coronavirus disease. The BOP reports that as of September 21, 2020, there are 2,022 inmates and 669 staff members currently infected with the coronavirus. The BOP further reports that an additional 12,184 inmates and 1,088 staff members who contracted the virus have now recovered. Those numbers reflect that approximately 10% of the approximately 140,000 federal inmates have contracted the virus, a startlingly high infection rate. Should Carlos contract the virus while incarcerated, his ability to access reliable health care will be limited, and he will therefore be at heightened risk of severe illness or even death. While Carlos's crime was serious, it does not warrant subjecting him to an extended risk of contracting a potentially fatal disease.

The Need to Avoid Unwarranted Sentence Disparities

A substantially below-Guidelines sentence also would effectively avoid unwarranted sentence disparities in this case. Although Carlos's co-defendants have yet to be convicted or sentenced, it is submitted that Carlos's role in the offense was relatively minor in comparison to the roles allegedly played by his co-defendants and his sentence should reflect the relatively limited nature of his culpability.

Finally, it is well-settled law in this district and elsewhere that a court may consider a defendant's conditions of incarceration in determining a reasonable and appropriate sentence. See, e.g., United States v. Carty, 264 F.3d 191, 196 (2d Cir. 2001); United States v. Mateo, 299 F. Supp.2d 201, 207 (SDNY 2004); United States v. Francis, 129 F.2d 612, 619

Hon. J. Paul Oetken
September 22, 2020
Page 7

(SDNY 2001).[2]  In that regard, it is significant that the approximately 10 months Carlos has served thus far have been under extraordinarily harsh conditions of confinement.

      Carlos has been housed at the MDC since his arrest in mid-December 2019.  As Your Honor is well aware, conditions at the MDC are bad under the best of circumstances—and they have been particularly terrible this year.  When the coronavirus pandemic reached the United States, the MDC was one of the first BOP facilities placed on a complete lockdown.  For months, inmates were not permitted to leave their cells for any reason, or to mingle with one another in common areas.  Medical attention was limited, if not totally eliminated, for those inmates who did not contract the coronavirus. Hot meals were discontinued in favor of cold sandwiches, to be eaten in the cells.  Showers were limited to one or two a week, and recreation was cancelled.  Telephone access and inmate mail and email access were severely restricted.  In addition, just as the MDC began to relax some of the lockdown restrictions, the facility experienced another lockdown due to a "security issue." Carlos, whose family is in California and was unable to visit even before the pandemic struck, has had very limited contact with his family and has been largely isolated from his loved ones for the past seven months.

      During the lockdown, Carlos fell and struck his head, causing him to break a dental bridge.  The MDC has refused to repair it, leaving Carlos effectively without several teeth.  In addition, an eye problem he has suffered since 2019 has gotten worse, and has remained untreated. The medical department at the MDC has recognized that Carlos needs to see an eye specialist to deal with his condition, but as is all too common at the MDC, he has not been sent to such a specialist.  As a result, he is now largely without the ability to see through his left eye.  It is submitted that these extraordinarily harsh conditions of incarceration are worthy of substantial consideration when determining what sentence to impose, and that they warrant the imposition of a shorter term of imprisonment than might be warranted under ordinary circumstances.

Conclusion

      For all of the foregoing reasons, it is respectfully requested that the Court temper justice with mercy and sentence Carlos to a substantially below-Guidelines term of imprisonment. Such a sentence will satisfy the objectives of Section 3553(a), allow Carlos to resume working and supporting his daughter and extended family, and continue the rehabilitation he has already begun.

---

[2] Although the cited cases hold that harsh conditions of confinement may justify a downward departure under the Sentencing Guidelines, the defendant is not seeking a downward departure in this case, but rather only a non-Guidelines sentence based on an evaluation of the factors enumerated in § 3553(a).

Hon. J. Paul Oetken
September 22, 2020
Page 8

        Thank you in advance for your consideration of this letter.

        Respectfully submitted,

        Avraham C. Moskowitz

        Christopher R. Neff

cc:    AUSA Daniel Nessim (by ECF)